William D. Artus
629 L Street, Suite 104
Anchorage, Alaska   99501
Telephone: (907) 277-9918
Telefax: (907) 279-9918

Attorney for Plaintiffs

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT AT ANCHORAGE

| | |
|---|---|
| FRESHRAIN, LLC, AMERICA'S FRESH WATER, LLC and REFRESHED-AIR, LLC,           Plaintiffs, <br><br> v. <br><br> DENNIS J. JOHNSON, Individually and as the Sole or Majority Shareholder of ALPHA/OMEGA ENVIRONMENTAL, INC., a Colorado Corporation and as the Sole or Majority Member of DWAP, LLC, a Colorado Limited Liability Company, <br><br>          Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No. 3AN-12-_08331_ CI |

**COMPLAINT**

Plaintiffs FreshRain, LLC, America's Fresh Water, LLC and Refreshed-Air, LLC, by and through their attorney, William D. Artus, complain and allege as follows:

1.    Plaintiff FreshRain, LLC (FreshRain) is an Alaska limited liability company that has its principal office at 6111 Quinhagak Street in Anchorage, Alaska.  FreshRain has filed all required reports, paid all required fees and is fully qualified to bring and maintain this  action.

-1-

Exhibit A
Page 1 of 37

2. Plaintiff America's Fresh Water, LLC (AFW) is an Alaska limited liability company that has its principal office at 6111 Quinhagak Street in Anchorage, Alaska. AFW has filed all required reports, paid all required fees and is fully qualified to bring and maintain this action.

3. Plaintiff Refreshed-Air, LLC (Refreshed-Air) is an Alaska limited liability company that has its principal office at 6111 Quinhagak Street in Anchorage, Alaska. Refreshed-Air has filed all required reports, paid all required fees and is fully qualified to bring and maintain this action.

4. Defendant Dennis J. Johnson ("Johnson")is a Colorado resident that has had extensive business dealings with plaintiffs in Alaska. This court has jurisdiction over the defendant and the subject matter of this lawsuit.

5. At all material times Johnson was the president of Alpha/Omega Environmental, Inc., (Alpha/Omega) a Colorado corporation, and he owned all or a majority of the issued and outstanding stock of Alpha/Omega. and DWAP, LLC, ("DWAP") an Alaska limited liability company.

6. At all material times Johnson was the managing member of DWAP, LLC, a Colorado limited liability company (DWEAP), and he owned all or a majority of the membership interests in DWAP.

7. Johnson caused the Colorado Secretary of State to voluntarily dissolve Alpha/Omega on March 9, 2012. A copy of the

3AN-12-_____ CI
Complaint
Freshrain, et al. v. Johnson, et al.

-2-

printout from the Office of the Colorado Secretary of State that confirms the dissolution of Alpha/Omega on March 9, 2012 is attached as Exhibit 1.

8.   Johnson caused the Colorado Secretary of State to voluntarily dissolve DWAP on March 9, 2012. A copy of the printout from the Office of the Colorado Secretary of State that confirms the dissolution of DWAP on March 9, 2012 is attached as Exhibit 2.

9.   Prior to its dissolution, Alpha/Omega entered into licensing or permit agreements and other agreements with plaintiffs.  The following are some of the agreements between Alpha/Omega and plaintiffs:

a.   An agreement titled Exclusive Permit Agreement that is dated May 27, 2011 between Alpha/Omega and Refreshed-Air. A copy of that agreement is attached as Exhibit 3;

b.   An agreement titled Exclusive Permit Agreement that is dated May 27, 2011 between Alpha/Omega and AFW. A copy of that agreement is attached as Exhibit 4;

c.   An agreement titled Exclusive Permit Agreement that is dated September 30, 2009 between Alpha/Omega and FreshRain. A copy of that agreement is attached as Exhibit 5; and

d.   An agreement titled Alpha-Omega Environmental and FreshRain Reciprocal "Tool(s) Access" Agreement that is dated March 17 and March 18, 2010 between Alpha/Omega and FreshRain. A copy of that agreement is attached as Exhibit 6.

3AN-12-_____ CI
Complaint
Freshrain, et al. v. Johnson, et al.

-3-

Exhibit A
Page 3 of 37

10. Plaintiffs paid substantial sums to Johnson and Alpha/Omega for the right to use the technology, systems, processes, equipment, products, logos, trade names, business names and other things described in Exhibits 3 through 6 (collectively "the Technology"), and to purchase and acquire products that are manufactured or fabricated by using the Technology, and plaintiffs are in full compliance with all of their obligations under the agreements.

11. Even though Johnson voluntarily dissolved Alpha/Omega, plaintiffs are entitled to use the Technology described in Exhibits 3 through 6 for so long as the Technology is needed for the business of plaintiffs.

12. Notwithstanding plaintiffs' right to use the Technology, Johnson has violated and is continuing to violate the agreements that he signed as the president and majority owner of the stock of Alpha/Omega by, among other things, taking specific action to interfere with the rights of plaintiffs to obtain, use and market the Technology. Johnson has contacted persons and companies that supply the Technology to plaintiffs and requested those persons and companies to refuse to provide the Technology to plaintiffs.

13. The actions and conduct of Johnson in interfering with the contractual rights of plaintiffs to obtain, use and market the Technology, and in attempting to prevent plaintiffs from obtaining, using and marketing the Technology, has caused economic harm and

3AN-12-_____ CI
Complaint
Freshrain, et al. v. Johnson, et al.

-4-

damage to plaintiffs and such economic harm and damage will continue unless Johnson is restrained from interfering with the rights of plaintiffs under the agreements that are attached as Exhibits 3 through 6.

14. Plaintiffs are entitled to an order and judgment of this court that affirms and decrees that:

a. The contracts that are attached as Exhibit 3 through 6 are legal, valid and binding contracts of Alpha/Omega and Johnson, and enforceable against both Alpha/Omega and Johnson in accordance with their respective terms;

b. Plaintiffs are entitled to all of the rights, benefits, and privileges described and given in the contracts including, but not limited to, the right to purchase, acquire, obtain, use and market the Technology described in the contracts, including the applicable trade names and logos; and

c. Enjoins, prohibits and prevents Johnson and Alpha/Omega, and any company or entity in which Johnson or any member of Johnson's family has an interest, from interfering in any way with the rights of plaintiffs under the contracts.

15. In addition to the injunctive relief that is requested in Paragraph 13, Plaintiffs are entitled to an award of monetary damages against Johnson for the economic harm and damage they have sustained or will sustain because of the conduct and actions of Johnson in interfering with their rights under the contracts.

3AN-12-_____ CI
Complaint
Freshrain, et al. v. Johnson, et al.

-5-

Case 3:12-cv-00162-RRB   Document 1-1   Filed 08/08/12   Page 5 of 37

WHEREFORE plaintiffs pray for relief as follows:

1. For entry of an order and judgment that affirms and decrees that:

a. The contracts that are attached as Exhibit 3 through 6 are legal, valid and binding contracts of Alpha/Omega and Johnson, and enforceable against both Alpha/Omega and Johnson in accordance with their respective terms;

b. Plaintiffs are entitled to all of the rights, benefits, and privileges described and given in the contracts including, but not limited to, the right to purchase, acquire, obtain, use and market the Technology described in the contracts, including the applicable trade names and logos; and

c. Johnson and Alpha/Omega, and any company or entity in which Johnson or any member of Johnson's family has an interest, are enjoined and prohibited from interfering in any way with the rights of plaintiffs under the contracts.

2. An order and judgment that awards monetary damages against Johnson to compensate plaintiffs for the economic harm and damage they have sustained and will sustain because of the conduct and actions of Johnson in interfering with the rights of plaintiffs under the contracts.

3. For such other and further relief as may be appropriate or necessary.

3AN-12-_____ CI
Complaint
Freshrain, et al. v. Johnson, et al.

-6-

DATED at Anchorage, Alaska on July 9, 2012.

William D. Artus
Attorney for Plaintiffs
ABA No. 7410059

3AN-12-_____ CI
Complaint
Freshrain, et al. v. Johnson, et al.

-7-

Exhibit A
Page 7 of 37



# Colorado
### Secretary of State
Scott Gessler

Business & Licensing   |   Elections & Voting      Search for...    GO

**For this Record...**
History & Documents
File a Document
Subscribe Email Notification
Unsubscribe Email Notification

Business Home
Business Information
Business Search

FAQs, Glossary and Information

# Summary

| | |
|---|---|
| ID Number: | 19941020643 |
| Name: | ALPHA/OMEGA ENVIRONMENTAL, INC., Dissolved March 9, 2012 |

| | |
|---|---|
| Registered Agent: | DENNIS J. JOHNSON |
| Registered Agent Street Address: | 8530 WINDFALL WAY, COLORADO SPRINGS, CO 80908, United States |
| Registered Agent Mailing Address: | |

| | |
|---|---|
| Principal Street Address: | 8530 WINDFALL WAY, COLORADO SPRINGS, CO 80908 , United States |
| Principal Mailing Address: | 8530 Windfall Way, Colorado Springs, CO 80908, United States |

| | |
|---|---|
| Status: | Voluntarily Dissolved |
| Form: | Corporation |
| Jurisdiction: | Colorado |
| Formation Date: | 02/22/1994 |
| Term of Duration: | Perpetual |
| Periodic Report Month: | February |

You may:

- View History and Documents
- File a Document
- Set Up Secure Business Filing for this Record
- Subscribe to email notification regarding this record
- Unsubscribe from email notification regarding this record

[ Previous Page ]

Terms and Conditions

EXHIBIT ___1___
Page ___1___ of ___1___

www.sos.state.co.us/biz/BusinessEntityDetail.do?quitButtonDestination...





**Colorado**
Secretary of State
Scott Gessler

Business & Licensing  |  Elections & Voting       [Search for ...]

**For this Record...**
History & Documents
File a Document
Subscribe Email
Notification
Unsubscribe Email
Notification

Business Home
Business Information
Business Search

FAQs, Glossary and
Information

# Summary

| | |
|---|---|
| ID Number: | 20061441957 |
| Name: | DWAP, LLC, Dissolved March 9, 2012 |
| Registered Agent: | Kevin D. Johnson |
| Registered Agent Street Address: | 8530 Windfall Way, Colorado Springs, CO 80908, United States |
| Registered Agent Mailing Address: | |
| Principal Street Address: | 8530 Windfall Way, Colorado Springs, CO 80903, United States |
| Principal Mailing Address: | 8530 Windfall Way, Colorado Springs, CO 80908, United States |
| Status: | Voluntarily Dissolved |
| Form: | Limited Liability Company |
| Jurisdiction: | Colorado |
| Formation Date: | 10/30/2006 |
| Term of Duration: | Perpetual |
| Periodic Report Month: | August |

You may:

- View History and Documents
- File a Document
- Set Up Secure Business Filing for this Record
- Subscribe to email notification regarding this record
- Unsubscribe from email notification regarding this record

[ Previous Page ]

Terms and Conditions

EXHIBIT __2__
Page __1__ of __1__

Exhibit A
Page 9 of 37



**EXCLUSIVE PERMIT AGREEMENT**

Alpha-Omega Environmental, Inc.

And Refreshed-Air, LLC.

1. <u>Effective Date, Parties:</u> This permit is granted as of this __27__ day of May, 2011 by Alpha-Omega Environmental, Inc. a Colorado corporation having offices at 8530 Windfall Way, Colorado Springs, Colorado 80908, hereinafter referred to as AOE. The permit is granted to Refreshed-Air, LLC. (RA) an Alaskan LLC having offices at __1601 E 84th Ave Suite 204_____ , Anchorage, Alaska __99507___, hereinafter referred to as RA.

2. <u>Intent/Exclusive Technology Permit and Market Provisions:</u> AOE shall provide to RA an exclusive technology permit utilization authority as pertains to specific (any/all) home and commercial Air Pollution Treatment, with associated water purification support scrubber technology including commercial, and industrial "stack emissions" air pollution filtration in the global market(s). Said exclusive permit market rights shall apply for the manufacture, sales, and distribution of the AOE eOXIS® process air pollution treatment equipment with usage warranted to RA for existing AOE trade secrets and proprietary technology. Exhibit A., as hereto attached, specifically defines any and all water and air treatment technology market(s) or application excluded from this permit. The technology and market rights as defined above are specifically applied to the following AOE technologies:

   a. Vapor Ion Plasma / free electron (VIP/fe$^R$) system, [non-chemical water treatment and purification]
   b. Electronic Oxidation and Ion Separation (eOXIS®) process, [polarized electrically active filtration system]
   c. Cavitator™ [vapor ion gas-to-liquid injection transfer system] pump injector unit
   d. eFilt™ electronically activated scrubber filter system
   e. Quad-Pac™ High rate filtration technology systems.

   RA shall be authorized to acquire certain AOE proprietary components necessary for the integration, assembly, and manufacturing of the air filtration using water purification and filter enhancement treatment systems. This technology permit shall also include and make available to RA improvements to the technology and components covered by this permit. AOE shall make available to RA technical documents necessary to support the production, assembly, and manufacture of such systems as specified in this Agreement. The issuance of this technology permit does not transfer any ownership interest or provide any claim to any trade secrets, trademarks, or patent(s) or patent(s)

**EXHIBIT** _3_

**Page** _1_ of _9_

pending owned or submitted by AOE. AOE shall retain rights to proprietary process chemistry technologies.

This exclusive technologies permit for the areas North America, Central America, South America, Australia, and New Zealand permit right and authority, to the exclusion of AOE or any AOE subsidiary or its affiliate, is granted to RA on a perpetual and royalty free basis; as contingent to all terms and conditions of this exclusive permit Agreement and the associated and binding Refreshed-Air, LLC Operating Agreement.

**NOTE:** Specific to air purification markets, the term of intellectual property protection shall be binding through the term of the last issued international and US patent applicable to this agreement. All new technology patents shall be owned on a 50% AOE and 50% RA basis; with prosecution and filing fees paid for by AOE and RA on a 50%/50% basis. Outside of the RA permitted markets, AOE shall have total access use of said new patent rights on a non royalty payment basis.

3. <u>Sub-licenses, Right to Contract with Others:</u> RA does not have the right to grant any sub-licenses in its exercise of this permit without the express and written consent of AOE. AOE will not unreasonably withhold such sub licenses upon request. Any proposed sub-licenses granted hereunder shall be in writing and shall expressly include the same obligations with respect to AOE and the protection of proprietary data. An AOE Non-Disclosure/Non-Circumvention Agreement will be executed by prospective sub-licensees prior to the issuance of any sub-license. RA has the right to contract with others to supply components or production design, manufacturing, and assembly services in connection with effectuation of this permit; however AOE shall approve all final engineering and manufacturing designs and authorize in writing all such service and component suppliers before RA signs any contract for said services.

4. <u>Trade Secrets and Confidential Know-How:</u>

   a. <u>Confidentiality Agreement:</u> In furtherance of the exclusive permit granted above, AOE agrees to provide RA with trade secrets, confidential know-how, and other necessary information as specified herein. RA agrees to take reasonable steps to protect the confidentiality of any information identified by AOE as confidential or proprietary, and in particular to ensure that all RA employees, sub-licensees, contractors, suppliers, consultants, outside sales personnel, and others in privity with RA and having access to such confidential information take similar steps to protect the confidentiality of any information supplied to them. RA and its employees, principals, agents, and consultants shall execute Agreements specifically recognizing AOE's interest in the confidential information and agreeing to safeguard the same.

   b. <u>Public Information:</u> The obligations to protect confidential information shall not, in any event, extend to any item of information which (a) becomes

EXHIBIT ___3___
Page ___2___ of ___9___

available to the general public through no act or fault of RA or (b) is rightfully disclosed to RA by a third party.

c. Restricted Uses: RA shall take all reasonable steps necessary to prevent the use of all confidential or proprietary information disclosed to it in any market not permitted hereunder, inclusive of any and all pending patent(s) information.

5. Payments / Cancellations:

a. Initial Funding: This permit shall be binding upon the formation of the RA corporate entity (herein defined) and upon confirmation of funding into the new LLC of _Fifty Thousand_____ dollars ($_50,000_____ USD), prior to 28 May, 2011.

b. Permit Fee Payment: In exchange for the rights granted herein, RA shall pay to AOE a total permit fee of $1,000,000 USD. RA shall pay this fee to AOE in the following increments and upon completion of the specified activities:

 i. From the date of this Agreement an initial and binding $50,000 fee.
  1. A $50,000 payment is due payable upon signature of this document.
  2. The second $50,000 payment is to be paid 45 days after the first payment.

 ii. The third payment of $100,000 will be paid upon completion of these defined activities.
  1. Completion of the independent test by Industrial Labs in Wheatridge, CO or equivalent certifying that the Refreshed-Air process system works as advertised.

 iii. The fourth payment of $100,000 shall be made when the process system is approved by the EPA and NSF or the Hospital(s) US Certification Board for use in hospitals in the US or by private sector building management successful application.

 iv. A final payment of $700,000 is to be paid at the time that all technology transfer has been completed and made available to RA and the product is ready for manufacture.

6. Breach Termination: Either party shall have the right to terminate this Agreement upon obvious Agreement(s) material breach thereof by the other, provided that the party alleged to be in breach shall be provided timely (60 days) notice of the alleged breach and a reasonable time (120 days) within which to cure the alleged breach.

7. Product Liability Insurance: RA shall maintain product liability insurance covering all products manufactured or supplied by it pursuant to the permit granted hereunder sufficient to protect AOE as a co-insured entity from claims of all

EXHIBIT __3__
Page __3__ of __9__

parties alleging injury or other damage due to an alleged deficiency in the manufacture or design of said products.

8. Prosecution and Maintenance of Patents:
    AOE and RA shall jointly administer and take the necessary actions to protect the patents and shall jointly bear all cost 50% AOE and 50% AFW and shall jointly own the patents AOE 50% and AFW 50%.

    a. Patents and Maintenance Costs: AOE or its nominees and AFW or its nominees agree to pay all fees and take all actions reasonably required to file a new 2010/2012 pending patent and maintain the upcoming U.S. patent as it becomes issued and permitted hereunder as valid and enforceable throughout the term of this Agreement.

    b. Additional Patents: Any additional patents that may be obtained by AOE at its sole discretion, and having applicability to the products or services RA is permitted to provide hereunder shall be included in the permit granted hereby at no additional charge to RA. AOE shall not be required to obtain any additional second or continuation patents at its own cost.

    RA may request and AOE may agree to co-author with RA and prosecute any pending patent applications and to obtain any additional patents, including foreign patents, provided that RA pay 100% of all costs related hereto. Any such additional patents obtained at the expense of RA shall automatically be included in the AOE permit under no additional charge to RA; AOE shall also have "outside markets" unrestricted use (royalty free) access to said patents.

    c. Patents: Any inventions, improvements, or new processes, whether patented or not, made by employees, officers, or consultants of RA, or by other persons in privity with RA in performance under this Agreement shall be and remain the property of RA, however, to the extent such inventions, improvements or new processes shall be useful to AOE in furtherance of AOE business interests outside the scope of this permit, AOE shall have a royalty-free license to practice such inventions, improvements or new processes within AOE markets not in competition to the RA permitted markets described herein.

9. Enforcement of Patents: AOE and RA shall enforce the patents and patent applications as permitted to RA hereunder. If, after request from RA, AOE rejects to enforce the patent(s) and patent application(s) as permitted hereunder against a party offering or infringing products or services within the scope of the RA permit granted hereunder and within the territorial scope thereof, RA may proceed against the alleged infringer at its own risk and expense. AOE agrees to assist RA in so doing as may reasonably be required, subject to mutually acceptable terms and conditions.

EXHIBIT __3__
Page __4__ of __9__

10. Record Inspection and Audit:

    a. AOE shall have the right, upon reasonable notice, to inspect RA's accounting books and records and all other documents and materials in RA's possession or control with respect to the subject matter of this Agreement. AOE shall have free and full access thereto for such purposes and may make copies thereof.

    b. All books and records relative to RA obligations hereunder shall be maintained and made accessible to AOE for inspection at a location in the United States for at least three years in the event of termination of this Agreement.

11. Miscellaneous: Nothing herein shall constitute or be interpreted to make either party the agent of the other party, and neither party shall be authorized to obligate or act on behalf of the other party in any transactions with a third party.

Each party agrees that any delay or omission on the part of the other party to exercise any right under this Agreement will not operate as a waiver of such right or any other right, and a waiver of any right by the other party hereunder on one occasion will not be construed as a bar to or a waiver of exercising the right on any other occasion.

Each party agrees that, should any provision of this Agreement be determined by a court of competent jurisdiction to violate or contravene any applicable law or policy, such provision may be severed and modified by the court to the extent necessary to comply with the applicable law or policy, and such modified provision and the remainder of the provisions hereof will continue in full force and effect.

The title, caption, or heading of any provision in this Agreement is used as a matter of convenience and is not to be used to interpret or construe the meaning of the provision.

A signed facsimile of this Agreement shall fully bind each of the parties hereto. A copy of the signed original shall be sent to the other party by U.S. certified mail to the party's address or emailed accordingly.

12. Settlement of Disputes: Any claim or controversy arising out of or relating to this Agreement or to the breach of this Agreement shall be settled by arbitration in accordance with the rules of the American Arbitration Association, by one or more arbitrators appointed in accordance with the Rules, and judgment on the award granted by the arbitrator may be entered in any court having jurisdiction thereof. The place of arbitration shall be Denver County, Colorado, or any place mutually agreed by the parties.

13. Choice of Law: This Agreement shall be interpreted under the law of, and in the courts of, the State of Colorado.

EXHIBIT 3
Page 5 of 9

14. Agreement is Personal:  This Agreement is personal to both parties, and neither party may assign or sub-license, in whole or in part, its rights and duties hereunder to a third party, except a purchaser of the entire assets and liabilities thereof, without the express written consent of the other.

15. Exclusion:  This Agreement represents the sole technology and markets permit Agreement that exists between the parties, to the exclusion of any prior descriptions or oral discussions.

IN WITNESS WHEREOF, and intending to be bound thereby, the parties hereto have caused their duly appointed officers to execute this Agreement.

PERMIT GRANTER:   Alpha – Omega Environmental, Inc.
Officer Name:   Dennis J. Johnson
Title:   President/CEO

Signature: _____

Date: MAY 26, 2011

PERMIT RECIPIENT:  Refreshed-Air, LLC.
Officer Name:   R.D. Klein, Jr.
Title:   Managing Member

Signature: _____

Date: 5-26-11

EXHIBIT 3
Page 6 of 9

Exhibit A

This exhibit represents a definitive listing of Dennis J. Johnson (Johnson, et all.) personal and /or corporate owned water treatment and process purification technology market(s) that are to be specifically identified as either excluded or included from any business, permit, marketing or license or license association with:

Refreshed-Air, LLC
(RA)
(an Alaska LLC)

The specific Johnson Technology market(s) that are that are defined as specifically included or excluded from business association(s) with RA either individually or collectively, are listed as follows:

1. Boiler descaling and building/facility purification market(s) are not included in the RA agreement
2. Global humanitarian (including impoverished and or disaster-stricken nations) drinking water purification is excluded
3. Global cooling water treatment market(s) are excluded.
4. Global De-salinization (seawater and/or brackish water) "salt/biological removal" process treatment and purification market(s) are excluded.

EXHIBIT 3
Page 7 of 9

5. Global Aqua-culture "habitat and processing waste water sanitizing, treatment and purification market(s) are not included in the RA agreement.

6. Global Hydroponic greenhouse irrigation water treatment and purification market(s) are not included in the RA agreement.

7. Precious metal waste water processing and process water (extraction) treatment "enhanced" recovery market(s) are not included in the RA agreement.

8. Global "industrial manufacturing" machine tool coolant (recycle and waste disposal) purification and treatment markets(s) are excluded from the RA agreement.

9. Global "Carbon conversion" (Alternative energy) production systems process water recycle purification and recovery treatment market(s) are not included in the RA agreement

10. Global $CO_2$ process water quenching/scrubbing "sequestration" removal treatment of $CO_2$ release in in alternative energy production systems and/or small diesel or gasoline engine exhaust are not included in the RA agreement.

11. Global Oil and/or gas drilled well waste or waste or recycle production (frack) water purification and treatment market(s) are excluded from the RA agreement.

12. Global energy and/or fuel global production markets are not included

13. Global placer mining water is not included in the RA agreement.

EXHIBIT _3_
Page _8_ of _9_

14. Global medical application market(s) are not included in the RA agreement.
15. Alaska Pristine Technologies, LLC water treatment markets excluded in accordance with previous agreements.
16. Freshrain, LLC Hot Tubs, Spas, and Pools water treatment in the US markets are excluded per previous agreement.

Note: The above "excluded" markets descriptive listing is not to be considered all inclusive! Specific and defined geography territory and applicable (permitted) market(s) are listed individually for RA, any market(s) not defined as "included" market(s) are then subsequently documented as Excluded.

Date: MAY 26, 2011 _____
Dennis J. Johnson
AOE

Date: 5-26-2011 _____
R.D. Klein, Jr.
RA Managing Member

EXHIBIT 3
Page 9 of 9



## EXCLUSIVE PERMIT AGREEMENT

Alpha-Omega Environmental, Inc.

And Americas Fresh Water LLC.

1. <u>Effective Date, Parties:</u>  This permit is granted as of this __27__ day of May, 2011 by Alpha-Omega Environmental, Inc. a Colorado corporation having offices at 8530 Windfall Way, Colorado Springs, Colorado 80908, hereinafter referred to as AOE.  The permit is granted to America's Fresh Water, LLC., an Alaskan LLC having offices at _1601 E 84th Ave Suite 204_____ , Anchorage, Alaska __99507____ , hereinafter referred to as AFW.

2. <u>Intent/Exclusive Technology Permit and Market Provisions:</u>  AOE shall provide to AFW an exclusive technology permit utilization authority as pertains to specific (any/all) water treatment and enhanced filtration for residential, commercial and industrial markets including agricultural water treatment, mining and mineral extraction except those market(s) as specified excluded in Exhibit A within North America, South America, Central America, Australia and New Zealand.  Said exclusive permit market rights shall apply for the manufacture, sales, and distribution of the AOE eOXIS® process water treatment equipment with usage warranted to AFW for existing AOE trade secrets and proprietary technology. Exhibit A, as hereto attached, specifically defines any and all water purification technology market(s) or applications excluded from this permit. The technology and market rights as defined above are specifically applied to the following AOE technologies:

    a. Vapor Ion Plasma / free electron (VIP/fe$^R$) system, [non-chemical water treatment and purification]
    b. Electronic Oxidation and Ion Separation (eOXIS®) process, [polarized electrically active filtration system]
    c. Cavitator$^{TM}$ [vapor ion gas-to-liquid injection transfer system] pump injector unit
    d. eFilt$^{TM}$ Electronically Activated Scrubber Filter System
    e. Quad-Pac$^{TM}$ High rate filtration technology systems.

    AFW shall be authorized to acquire certain AOE proprietary components necessary for the integration, assembly, and manufacturing of water purification and filter enhancement treatment systems.  This technology permit shall also include and make available to AFW improvements to the technology and components covered by this permit.  AOE shall make available to AFW technical documents necessary to support the production, assembly, and manufacture of such systems as specified in this Agreement.  The issuance of this technology permit does not transfer any ownership interest or provide any claim to any trade

EXHIBIT __4__
Page __1__ of __10__

secrets, trademarks, or patent(s) or patent(s) pending owned or submitted by AOE.

This exclusive technologies permit right and authority in the listed select markets to the exclusion of AOE or any AOE subsidiary or its affiliate, is granted to AFW on a perpetual and royalty free basis; as contingent to all terms and conditions of this exclusive permit Agreement and the associated and binding AFW Operating Agreement.

**NOTE:** Specific to water purification markets, the term of intellectual property protection shall be binding through the term of the last issued international and US patent applicable to this agreement. All new technology patents shall be owned on a 50% AOE and 50% RA basis; with prosecution and filing fees paid for by AOE and RA on a 50%/50% basis. Outside of the RA permitted markets, AOE shall have total access use of said new patent rights on a non royalty payment basis.

3. Sub-licenses, Right to Contract with Others: AFW does not have the right to grant any sub-licenses in its exercise of this permit without the express and written consent of AOE. AOE cannot unreasonably withhold such sub-licenses. Any proposed sub-licenses granted hereunder shall be in writing and shall expressly include the same obligations with respect to AOE and the protection of proprietary data. An AOE Non-Disclosure/Non-Circumvention Agreement will be executed by prospective sub-licensees prior to the issuance of any sub-license. AFW has the right to contract with others to supply components or production design, manufacturing, and assembly services in connection with effectuation of this permit; however AOE shall approve and authorize in writing all final engineering and manufacturing designs and all such service and component suppliers before AFW signs any contract for said services.

4. Trade Secrets and Confidential Know-How:

   a. Confidentiality Agreement: In furtherance of the exclusive permit granted above, AOE agrees to provide AFW with trade secrets, confidential know-how, and other necessary information as specified herein. AFW agrees to take reasonable steps to protect the confidentiality of any information identified by AOE as confidential or proprietary, and in particular to ensure that all AFW employees, sub-licensees, contractors, suppliers, consultants, outside sales personnel, and others in privity with AFW and having access to such confidential information take similar steps to protect the confidentiality of any information supplied to them. AFW and its employees, principals, agents, and consultants shall execute Agreements specifically recognizing AOE's interest in the confidential information and agreeing to safeguard the same.

   b. Public Information: The obligations to protect confidential information shall not, in any event, extend to any item of information which (a) becomes available to the general public through no act or fault of AFW or (b) is rightfully disclosed to AFW by a third party.

EXHIBIT __4__ ²
Page __2__ of __10__

c. Restricted Uses: AFW shall take all reasonable steps necessary to prevent the use of all confidential or proprietary information disclosed to it in any market not permitted hereunder, inclusive of any and all pending patent(s) information.

5. Payments / Cancellations:

a. Initial Funding: This permit shall be binding upon the formation of the AFW corporate entity (herein defined) and upon confirmation of funding into the new LLC of _One Hundred Thousand_____ dollars ($_100,000_____ USD), on or before June 1, 2011.

b. Permit Fee Payment: In exchange for the rights granted herein, AFW shall pay to AOE a total permit fee of $5,000,000 USD. AFW shall pay this fee to AOE in the following increments and upon completion of the specified activities:

   i. From the date of this Agreement the following payments will be made
      1. A $100,000 payment is due payable upon signing of this agreement (June 1st of 2011)
      2. The second $300,000 payment will be paid upon the successful completion of the Industrial Test Labs in Wheatridge, CO. certifying that the processing system works to the required specifications. (The criteria will be defined and agreed to with this agreement)
      3. The 3rd payment of $150,000 will be made upon the successful completion of the NSF tests.
      4. The 4th payment of $150,000 will be made upon the successful completion of the EPA certification of the processing system for use in drinking water treatment applications.
      5. The 5th payment of $1,750,000 will be made when the State of Colorado and the State of Washington have accepted the AOE processing system for drinking water.
      6. The remaining balance shall be paid at the time that all technology transfer has been completed and made available to AFW and the product is ready for manufacture.

6. Breach Termination: Either party shall have the right to terminate this Agreement upon obvious Agreement(s) material breach thereof by the other, provided that the party alleged to be in breach shall be provided timely (60 days) notice of the alleged breach and a reasonable time (120 days) within which to cure the alleged breach.

EXHIBIT 4 3
Page 3 of 10

Exhibit A
Page 21 of 37

7. Product Liability Insurance: AFW shall maintain product liability insurance covering all products manufactured or supplied by it pursuant to the permit granted hereunder sufficient to protect AOE as a co-insured entity from claims of all parties alleging injury or other damage due to an alleged deficiency in the manufacture or design of said products.

8. Prosecution and Maintenance of Patents:
   AOE and AFW agree to split all patenting cost 50%/50% each, to joint bear the patent maintenance responsibilities and to jointly own the patents 50% each.

   a. Patents and Maintenance Costs: AOE or its nominees and AFW or its nominees agrees to pay and equal split of all fees and take all actions reasonably required to file a new 2011/2012 pending patent and maintain the upcoming U.S. patent as it becomes issued and permitted hereunder as valid and enforceable throughout the term of this Agreement.

   b. Additional Patents: Any additional patents that may be obtained by AOE and AFW as required or desired, and having applicability to the products or services AFW is permitted to provide hereunder shall be included in the permit granted hereby at no additional charge to AFW. AOE shall not be required to obtain any additional second or continuation patents at its own cost.

   AFW may request and AOE may agree to co-author with AFW and prosecute any pending patent applications and to obtain any additional patents, including foreign patents, provided that AFW pay 100% of all costs related hereto. Any such additional patents obtained at the expense of AFW shall automatically be included in the AOE permit under no additional charge to AFW; AOE shall also have "outside markets" unrestricted use (royalty free) access to said patents.

   c. Patents: Any inventions, improvements, or new processes, whether patented or not, made by employees, officers, or consultants of AFW, or by other persons in privity with AFW in performance under this Agreement shall be and remain the property of AFW, however, to the extent such inventions, improvements or new processes shall be useful to AOE in furtherance of AOE business interests outside the scope of this permit, AOE shall have a royalty-free license to practice such inventions, improvements or new processes within AOE markets not in competition to the AFW permitted markets described herein.

9. Enforcement of Patents: AOE and AFW shall jointly enforce the patents and patent applications as permitted to AFW hereunder. If, after request from AFW, AOE rejects to enforce the patent(s) and patent application(s) as permitted hereunder against a party offering or infringing products or services within the scope of the AFW permit granted hereunder and within the territorial scope

EXHIBIT 4    4
Page 4 of 10

thereof, AFW may proceed against the alleged infringer at its own risk and expense. AOE agrees to assist AFW in so doing as may reasonably be required, subject to mutually acceptable terms and conditions.

10. Record Inspection and Audit:

    a. AOE shall have the right, upon reasonable notice, to inspect AFW's accounting books and records and all other documents and materials in AFW's possession or control with respect to the subject matter of this Agreement. AOE shall have free and full access thereto for such purposes and may make copies thereof.

    b. All books and records relative to AFW obligations hereunder shall be maintained and made accessible to AOE for inspection at a location in the United States for at least three years in the event of termination of this Agreement.

11. Miscellaneous: Nothing herein shall constitute or be interpreted to make either party the agent of the other party, and neither party shall be authorized to obligate or act on behalf of the other party in any transactions with a third party.

Each party agrees that any delay or omission on the part of the other party to exercise any right under this Agreement will not operate as a waiver of such right or any other right, and a waiver of any right by the other party hereunder on one occasion will not be construed as a bar to or a waiver of exercising the right on any other occasion.

Each party agrees that, should any provision of this Agreement be determined by a court of competent jurisdiction to violate or contravene any applicable law or policy, such provision may be severed and modified by the court to the extent necessary to comply with the applicable law or policy, and such modified provision and the remainder of the provisions hereof will continue in full force and effect.

The title, caption, or heading of any provision in this Agreement is used as a matter of convenience and is not to be used to interpret or construe the meaning of the provision.

A signed facsimile of this Agreement shall fully bind each of the parties hereto. A copy of the signed original shall be sent to the other party by U.S. certified mail to the party's address or emailed accordingly.

12. Settlement of Disputes: Any claim or controversy arising out of or relating to this Agreement or to the breach of this Agreement shall be settled by arbitration in accordance with the rules of the American Arbitration Association, by one or more arbitrators appointed in accordance with the Rules, and judgment on the award granted by the arbitrator may be entered in any court having jurisdiction thereof. The place of arbitration shall be Denver County, Colorado, or any place mutually agreed by the parties.

EXHIBIT 4
Page 5 of 10

5

13. Choice of Law: This Agreement shall be interpreted under the law of, and in the courts of, the State of Colorado.

14. Agreement is Personal: This Agreement is personal to both parties, and neither party may assign or sub-license, in whole or in part, its rights and duties hereunder to a third party, except a purchaser of the entire assets and liabilities thereof, without the express written consent of the other.

15. Exclusion: This Agreement represents the sole technology and markets permit Agreement that exists between the parties, to the exclusion of any prior descriptions or oral discussions.

IN WITNESS WHEREOF, and intending to be bound thereby, the parties hereto have caused their duly appointed officers to execute this Agreement.

PERMIT GRANTER:   Alpha – Omega Environmental, Inc.
                            Officer Name: Dennis J. Johnson
                            Title: President/CEO

          Signature: _____

          Date: MAY 26, 2011

PERMIT RECIPIENT:   American Fresh Water, LLC
                            Officer Name: R.D. Klein, Jr.
                            Title: Managing Member

          Signature: _____

          Date: _____

EXHIBIT 4
Page 6 of 10

6

## Exhibit A

This exhibit represents a definitive listing of Dennis J. Johnson (Johnson, et all.) personal and /or corporate owned water treatment and process purification technology market(s) that are to be specifically identified as ~~either~~ excluded ~~or included~~ from any business, permit, marketing or license or license association with:

America's Fresh Water, LLC
(AFW)
(an Alaska LLC)

The specific Johnson Technology market(s) that are that are defined as specifically included or excluded from business association(s) with AFW either individually or collectively, are listed as follows:

1. Boiler descaling and building/facility purification market(s) are not included in the AFW agreement except in Markets in North America, South America, Central America, Australia, and New Zealand)
2. Global humanitarian (including impoverished and or disaster-stricken nations) drinking water purification are excluded
3. Global cooling water treatment market(s) are excluded.

EXHIBIT _4_
Page _1_ of _10_

4. Global De-salinization (seawater and/or brackish water) "salt/biological removal" process treatment and purification market(s) are excluded.
5. Contingent to an acceptable internet marketing plan, residential, private/commercial, or field application mobile disaster and emergency preparedness water process treatment and purification markets are included for North America, South America, Central America, Australia, and New Zealand.
6. Global Aqua-culture "habitat and processing waste water sanitizing, treatment and purification market(s) are not included in the AFW agreement.
7. Global Hydroponic greenhouse irrigation water treatment and purification market(s) are not included in the AFW agreement.
8. Precious metal waste water processing and process water (extraction) treatment "enhanced" recovery market(s) are included for markets in North America, South America, Central America, Australia, and New Zealand).
9. Global "industrial manufacturing" machine tool coolant (recycle and waste disposal) purification and treatment markets(s) are excluded from the AFW agreement.
10. Global "Carbon conversion" (Alternative energy) production systems process water recycle purification and recovery treatment market(s) are not included in the AFW agreement

EXHIBIT _4_
Page _8_ of _10_

11. Global $CO_2$ process water quenching/scrubbing "sequestration" removal treatment of $CO_2$ release in in alternative energy production systems and/or small diesel or gasoline engine exhaust are not included in the AFW agreement.

12. Global Oil and/or gas drilled well waste or waste or recycle production (frack) water purification and treatment market(s) are excluded from the AFW agreement.

13. Global energy and/or fuel global production markets are not included

14. Global placer mining water is not included in the AFW agreement.

15. Global medical application market(s) are not included in the AFW agreement.

16. Alaska Pristine Technologies, LLC water treatment markets excluded in accordance with previous agreements.

17. Freshrain, LLC Hot Tubs, Spas, and Pools water treatment in the US markets are excluded per previous agreement.

Note: The above "excluded" markets descriptive listing is not to be considered all inclusive! Specific and defined geography territory and applicable (permitted) market(s) are listed individually for AFW, any market(s) not defined as "included" market(s) are then subsequently documented as Excluded.

EXHIBIT 4
Page 9 of 10

Date: MAY 26, 2011 _____
Dennis J. Johnson
AOE

Date: May 26 2011 _____
R.D. Klein, Jr.
RA Managing Member



**EXCLUSIVE PERMIT AGREEMENT**

Alpha-Omega Environmental, Inc.

And

Fresh Rain, LLC.

1. <u>Effective Date, Parties:</u> This permit is granted as of this  30    day of September, 2009 by Alpha-Omega Environmental, Inc. a Colorado corporation having offices at 8530 Windfall Way, Colorado Springs, Colorado 80908, hereinafter referred to as AOE.  The permit is granted to Fresh Rain, LLC., an Alaskan corporation having offices at  1601 E 84th Ave Suite 204         , Anchorage, Alaska  99507   , hereinafter referred to as FR.

2. <u>Intent/Exclusive Technology Permit and Market Provisions:</u>  AOE shall provide to FR an exclusive technology permit utilization authority as pertains to specific (any/all) home and residential hot tub and/or residential and commercial pool and spa markets within the United States of America.  Said exclusive permit market rights shall apply for the manufacture, sales, and distribution of the AOE eOXIS$^{®}$ process water treatment equipment with usage warranted to FR for existing AOE trade secrets and proprietary technology.  The technology and market rights as defined above are specifically applied to the following AOE technologies:

    a. Vapor Ion Plasma / free electron (VIP/fe$^{™}$) system, [non-chemical water treatment and purification]
    b. Electronic Oxidation and Ion Separation (eOXIS$^{®}$) process, [polarized electrically active filtration system]
    c. Cavitator$^{™}$ [vapor ion gas-to-liquid injection transfer system] pump injector unit

    FR shall be authorized to acquire certain AOE proprietary components necessary for the integration, assembly, and manufacturing of the hot tub/spa/pool water purification and filter enhancement treatment systems.  This technology permit shall also include and make available to FR improvements to the technology and components covered by this permit.  AOE shall make available to FR technical documents necessary to support the production, assembly, and manufacture of such systems as specified in this Agreement.  The issuance of this technology permit does not transfer any ownership interest or provide any claim to any trade secrets, trademarks, or patent(s) or patent(s) pending owned or submitted by AOE.   AOE shall retain ownership of "multiple markets" manufacturing and production tools, dies, and fixtures and their respective designs.

    This exclusive technologies (U.S. markets) permit right and authority, to the exclusion of AOE or any AOE subsidiary or its affiliate, is granted to FR on a perpetual and royalty free basis; as contingent to all terms and conditions of this

1

perpetual and royalty free basis; as contingent to all terms and conditions of this exclusive permit Agreement and the associated and binding Fresh Rain, LLC Operating Agreement.

**NOTE**: Specific to hot tub and pool/spa markets, an "additional 14 years of intellectual property protection" shall be initiated prior to 31 December, 2009 as AOE (or its assigns) shall file a new U.S. pending patent application. This filing shall include all free country appropriate PTO foreign filing recognitions that cites apparatus/methods/chemistry descriptions and extensive claims as relevant to the permitted technologies named in 2a. 2b. and 2c. above and including any expansions thereof.

3. Sub-licenses, Right to Contract with Others: FR does not have the right to grant any sub-licenses in its exercise of this permit without the express and written consent of AOE. Any proposed sub-licenses granted hereunder shall be in writing and shall expressly include the same obligations with respect to AOE and the protection of proprietary data. An AOE Non-Disclosure/Non-Circumvention Agreement will be executed by prospective sub-licensees prior to the issuance of any sub-license. FR has the right to contract with others to supply components or production design, manufacturing, and assembly services in connection with effectuation of this permit; however AOE shall approve and authorize in writing all such service and component suppliers before FR signs any contract for said services.

4. Trade Secrets and Confidential Know-How:

   a. Confidentiality Agreement: In furtherance of the exclusive permit granted above, AOE agrees to provide FR with trade secrets, confidential know-how, and other necessary information as specified herein. FR agrees to take reasonable steps to protect the confidentiality of any information identified by AOE as confidential or proprietary, and in particular to ensure that all FR employees, sub-licensees, contractors, suppliers, consultants, outside sales personnel, and others in privity with FR and having access to such confidential information take similar steps to protect the confidentiality of any information supplied to them. FR and its employees, principals, agents, and consultants shall execute Agreements specifically recognizing AOE's interest in the confidential information and agreeing to safeguard the same.

   b. Public Information: The obligations to protect confidential information shall not, in any event, extend to any item of information which (a) becomes available to the general public through no act or fault of FR or (b) is rightfully disclosed to FR by a third party.

   c. Restricted Uses: FR shall take all reasonable steps necessary to prevent the use of all confidential or proprietary information disclosed to it in any market not permitted hereunder, inclusive of any and all pending patent(s) information.

5. Payments / Cancellations:

    a. Initial Funding: This permit shall be binding upon the formation of the FR corporate entity (herein defined) and upon confirmation of funding into the new LLC of _Fifty Thousand_____ dollars ($_50,000_____ USD), prior to 30 September, 2009.

    b. Permit Fee Payment: In exchange for the rights granted herein, FR shall pay to AOE a total permit fee of $500,000 USD. FR shall pay this fee to AOE in the following increments and upon completion of the specified activities:

        i. From the date of this Agreement an initial and binding $100,000 fee.
            1. A $50,000 payment is due payable upon Agreement signature
            2. The second $50,000 payment is to be paid at the time that AOE ships ten (10) "hand assembled" VIP ion generation units to FR (as anticipated on/before 15 October, 2009).
        ii. A second payment of $100,000 will be paid upon completion of these defined activities.
            1. A $50,000 payment is to be paid at the time that AOE ships forty (40) "hand assembled" VIP ion generation units to FR (as anticipated on/before 31 October, 2009).
            2. A $50,000 payment is to be paid at the time that AOE ships fifty (50) "hand assembled" VIP ion generation units to FR (as anticipated on/before 30 November, 2009).
        iii. AOE will submit monthly invoices to FR for payment for inventory, procurement, and production of the one hundred (100) "hand build" VIP units cited above. FR will pay the AOE invoices on a net 15 day basis. AOE invoices will identify material and labor components of production.
        iv. A final payment of $300,000 is to be paid at the time that all production tools and dies are available to FR and a final functioning prototype unit is available for FR review.

6. Breach Termination: Either party shall have the right to terminate this Agreement upon obvious Agreement(s) material breach thereof by the other, provided that the party alleged to be in breach shall be provided timely (60 days) notice of the alleged breach and a reasonable time (120 days) within which to cure the alleged breach.

7. Product Liability Insurance: FR shall maintain product liability insurance covering all products manufactured or supplied by it pursuant to the permit granted hereunder sufficient to protect AOE as a co-insured entity from claims of all parties alleging injury or other damage due to an alleged deficiency in the manufacture or design of said products.

8. Prosecution and Maintenance of Patents:

   a. Patents and Maintenance Costs: AOE or its nominees agrees to pay all fees and take all actions reasonably required to file a new 2009 pending patent and maintain the upcoming U.S. patent as it becomes issued and permitted hereunder as valid and enforceable throughout the term of this Agreement.

   b. Additional Patents: Any additional patents that may be obtained by AOE at its sole discretion, and having applicability to the products or services FR is permitted to provide hereunder shall be included in the permit granted hereby at no additional charge to FR. AOE shall not be required to obtain any additional second or continuation patents at its own cost.

      FR may request and AOE may agree to co-author with FR and prosecute any pending patent applications and to obtain any additional patents, including foreign patents, provided that FR pay 100% of all costs related hereto. Any such additional patents obtained at the expense of FR shall automatically be included in the AOE permit under no additional charge to FR; AOE shall also have "outside markets" unrestricted use (royalty free) access to said patents.

   c. Patents: Any inventions, improvements, or new processes, whether patented or not, made by employees, officers, or consultants of FR, or by other persons in privity with FR in performance under this Agreement shall be and remain the property of FR, however, to the extent such inventions, improvements or new processes shall be useful to AOE in furtherance of AOE business interests outside the scope of this permit, AOE shall have a royalty-free license to practice such inventions, improvements or new processes within AOE markets not in competition to the FR permitted markets described herein.

9. Enforcement of Patents: AOE retains the sole right to enforce the patents and patent applications as permitted to FR hereunder. If, after request from FR, AOE rejects to enforce the patent(s) and patent application(s) as permitted hereunder against a party offering or infringing products or services within the scope of the FR permit granted hereunder and within the territorial scope thereof, FR may proceed against the alleged infringer at its own risk and expense. AOE agrees to assist FR in so doing as may reasonably be required, subject to mutually acceptable terms and conditions.

10. Record Inspection and Audit:

    a. AOE shall have the right, upon reasonable notice, to inspect FR's accounting books and records and all other documents and materials in FR's possession or control with respect to the subject matter of this

Agreement. AOE shall have free and full access thereto for such purposes and may make copies thereof.

b. All books and records relative to FR obligations hereunder shall be maintained and made accessible to AOE for inspection at a location in the United States for at least three years in the event of termination of this Agreement.

11. Miscellaneous: Nothing herein shall constitute or be interpreted to make either party the agent of the other party, and neither party shall be authorized to obligate or act on behalf of the other party in any transactions with a third party.

Each party agrees that any delay or omission on the part of the other party to exercise any right under this Agreement will not operate as a waiver of such right or any other right, and a waiver of any right by the other party hereunder on one occasion will not be construed as a bar to or a waiver of exercising the right on any other occasion.

Each party agrees that, should any provision of this Agreement be determined by a court of competent jurisdiction to violate or contravene any applicable law or policy, such provision may be severed and modified by the court to the extent necessary to comply with the applicable law or policy, and such modified provision and the remainder of the provisions hereof will continue in full force and effect.

The title, caption, or heading of any provision in this Agreement is used as a matter of convenience and is not to be used to interpret or construe the meaning of the provision.

A signed facsimile of this Agreement shall fully bind each of the parties hereto. A copy of the signed original shall be sent to the other party by U.S. certified mail to the party's address or emailed accordingly.

12. Settlement of Disputes: Any claim or controversy arising out of or relating to this Agreement or to the breach of this Agreement shall be settled by arbitration in accordance with the rules of the American Arbitration Association, by one or more arbitrators appointed in accordance with the Rules, and judgment on the award granted by the arbitrator may be entered in any court having jurisdiction thereof. The place of arbitration shall be Denver County, Colorado, or any place mutually agreed by the parties.

13. Choice of Law: This Agreement shall be interpreted under the law of, and in the courts of, the State of Colorado.

14. Agreement is Personal: This Agreement is personal to both parties, and neither party may assign or sub-license, in whole or in part, its rights and duties hereunder to a third party, except a purchaser of the entire assets and liabilities thereof, without the express written consent of the other.

15. Exclusion:  This Agreement represents the sole technology and markets permit Agreement that exists between the parties, to the exclusion of any prior descriptions or oral discussions.

IN WITNESS WHEREOF, and intending to be bound thereby, the parties hereto have caused their duly appointed officers to execute this Agreement.

PERMIT GRANTER:    Alpha – Omega Environmental, Inc.
                   Officer Name:   Dennis J. Johnson
                   Title:   President/CEO

Signature:   _Dennis J. Johnson_

Date:   ~~XX~~ 30 September, 2009


PERMIT RECIPIENT:  Fresh Rain, LLC.
                   Officer Name:
                   Title: Authorized APT Managing Member

Signature:   _Ralph Ndruga_

Date:   10/6/09

6

# Alpha Omega Environmental, Inc.

**8530 Windfall Way, Colorado Springs, CO 80908**

PH: 719-237-1293    FX: 719-495-1927    EM: prstinc.h@gmail.com

## ALPHA-OMEGA ENVIRONMENTAL AND FRESH RAIN RECIPROCAL "TOOL(S) ACCESS" AGREEMENT

Fresh Rain, LLC, an Alaska corporate entity, and Alpha-Omega Environmental, Inc., a Colorado corporate entity, entered into a 2009 permit agreement which provides Fresh Rain with exclusive marketing, manufacturing and distribution rights for the U.S. Pool and Hot Tub water purification markets. This agreement represents an addendum to the Fresh Rain / Alpha-Omega 2009 permit agreement and further provides "mutual sharing" (reciprocal) access to each individual party's production tool(s) and die(s), herein defined as follows:

A. Alpha-Omega owns an aluminum (heat exchanger) extrusion tool known as File No. VIP-1001/Rev. B, with production runs begin accomplished by Tower Extrusions in Olney, Texas. Fresh Rain will be provided and allowed 100% direct communication access to Tower Extrusions for the purpose of purchasing heat exchanger "pool, spa and hot tub markets" cylinder product materials (at direct cost) from Tower Extrusions. No mark-up cost will be applied from Alpha-Omega relative to said cylinders being manufactured and produced from the Alpha-Omega production tool, as to be applied for the Fresh Rain pool, spa and hot tub U.S. market activities.

B. Fresh Rain owns plastic injection molding tools and dies being initially manufactured and engineered by Alpha Mold West/Reata Engineering of Colorado, with initial production runs being accomplished by Alpha Mold West. Alpha-Omega Environmental and/or Dennis Johnson will be provided/allowed 100% direct communication access to Alpha Mold West and Reata Engineering for the purpose of purchasing plastic injected molded piece parts, to service the Alpha-Omega water treatment and purification markets. No mark-up cost will be applied by Fresh Rain or Reata Engineering relative to said plastic injected molded piece parts being manufactured and produced for the Alpha-Omega and/or Dennis Johnson water purification markets, as being applied outside of and excluding the Fresh Rain pool, spa and hot tub U.S. exclusive water purification markets. In the event Fresh Rain determines to engage U.S. or Foreign injection mold vendor "other(s)" (and no longer utilize Reata assembly or Alpha Mold West plastic injection molding production services), then Alpha-Omega and/or Dennis Johnson would be allowed/provided the same direct communication and no mark-up costs as relative to plastic injection molded ion generator piece parts purchase rights, as herein defined above.

**Tool(s) and Die(s) Production Wear Factors:**

Each individual party's production tool(s) will wear with repetitive production runs and will have to be remanufactured and/or replaced periodically. Relative to recording and tracking the time, date

EXHIBIT 6

Page 1 of 2

**WILLIAM D. ARTUS**
Attorney at Law _____ e-mail: artuslaw@alaska.com
8530 Windfall Way, Colorado Springs, CO 80989 L Street, Suite 104
Ph: 719-237-1293   Fx: 719-495-1927   Em: pristine.dj@gmail.com **Anchorage, Alaska 99501**
Telephone: 907/277-9918
Telefax: 907/279-9918

and number of piece parts actually produced for the individual party, from production runs off the
other party's tool, each party will be responsible for its pro-rata cost share payment to replace a worn
and out-of-spec fatigued tool. Specifically, each party will be "tracked" relative to the number of
units that said party has produced from the other party's tool(s), and compared to the number of units
that the other party has had produced from said tool(s) for a specific tool-life time interval. Upon an
individual tool wear failure, each party will be assessed a "fair share" tool replacement cost as based
upon pro-rata comparative tool(s) production of units usage between the parties, and shall
compensate the other party for said fair share replacement costs.

July 10, 2012
Don Wakefield
Court Process Service
1550 Hathaway Drive
Colorado Springs CO 80915

Re: FreshRain, LLC et. al. v. Dennis J. Johnson

Dear Don:

Enclosed are a summons and complaint for service on defendant Dennis J. Johnson. The residence
address I have for Dennis is 8530 Windfall Way in Colorado Springs and the zip code is 80908.
The applicable court rule in Alaska provides for service on any person of suitable age and
discretion (14 and older) at the residence. The telephone number for Dennis is 719-237-1293.

Enclosed is a copy of the check in the amount of $80 as the fee for the service of process and for a

**Alpha Omega Environmental, Inc.**

| | |
|---|---|
| **Fresh Rain, LLC** | **Alpha-Omega Environmental, Inc.** |
| Date: | Date:  18 March, 2010 |
| By:  R.D. KLEIN, JR | By:  DENNIS J. JOHNSON |
| CEO FRESHRAIN, LLC | PRESIDENT |
| Signature: | Signature: |

EXHIBIT  6
Page  2  of  2

Exhibit A
Page 36 of 37

 

## IN THE DISTRICT/SUPERIOR COURT FOR THE STATE OF ALASKA
## AT ANCHORAGE

FreshRain, LLC, et.al.,
       Plaintiff(s),

vs.

Dennis J. Johnson, et. al.,

       Defendant(s).

CASE NO. 3AN-12- 8331   CI

SUMMONS AND
NOTICE TO BOTH PARTIES
OF JUDICIAL ASSIGNMENT

To Defendant: **Dennis J. Johnson**

You are hereby summoned and required to file with the court a written answer to the complaint which accompanies this summons. Your answer must be filed with the court at 825 W. 4th Ave., Anchorage, Alaska 99501 within 20 days* after the day you receive this summons. In addition, a copy of your answer must be sent to the plaintiff's attorney or plaintiff (if unrepresented) **William Artus**      , whose address is: **629 L Street, Suite 104**
**Anchorage, Alaska 99501**

If you fail to file your answer within the required time, a default judgment may be entered against you for the relief demanded in the complaint.

If you are not represented by an attorney, you must inform the court and all other parties in this case, in writing, of your current mailing address and any future changes to your mailing address and telephone number. You may use court form *Notice of Change of Address / Telephone Number* (TF-955), available at the clerk's office or on the court system's website at www.state.ak.us/courts/forms.htm , to inform the court. - OR - If you have an attorney, the attorney must comply with Alaska R. Civ. P. 5(i).

### NOTICE OF JUDICIAL ASSIGNMENT

TO: Plaintiff and Defendant

You are hereby given notice that:

☒ This case has been assigned to Superior Court Judge *Easter*
and Master _____.

☐ This case has been assigned to District Court Judge _____

CLERK OF COURT

07/09/12
Date

By: A. Suyhtt
Deputy Clerk

I certify that on 07/09/12 a copy of this Summons was ☐ mailed ☒ given to
☐ plaintiff ☒ plaintiff's counsel along with a copy of the
☐ Domestic Relations Procedural Order ☐ Civil Pre-Trial Order
to serve on the defendant with the summons.
Deputy Clerk AD

* The State or a state officer or agency named as a defendant has 40 days to file its answer. If you have been served with this summons outside the United States, you also have 40 days to file your answer.

CIV-100 ANCH (10/05)(st.3)            Civil Rules 4, 5, 12, 42(c), 55
SUMMONS

Exhibit A
Page 37 of 37